FILED
United States Court of Appeals
Tenth Circuit

August 12, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

LUCRECIA CARPIO HOLMES,

　　　　Plaintiff - Appellant,

v.

COLORADO COALITION FOR THE
HOMELESS LONG TERM
DISABILITY PLAN,

　　　　Defendant - Appellee.

No. 13-1175

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:09-CV-02986-REB-BNB)**

---

Brian A. Murphy, Lakewood, Colorado, for Plaintiff-Appellant.

Richard N. Bien (Robyn L. Anderson, with him on the brief), Kansas City, Missouri, for Defendant-Appellee.

---

Before **KELLY, TYMKOVICH** and **McHUGH**, Circuit Judges.

---

**McHUGH,** Circuit Judge.

---

　　　　Plaintiff Lucrecia Carpio Holmes appeals the district court's ruling that her claim for disability benefits under the Employee Retirement Income Security Act (ERISA) is barred due to her failure to exhaust administrative remedies. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

# I.  BACKGROUND

Ms. Holmes is a former employee of the Colorado Coalition for the Homeless (the Coalition) and participated in an employee benefits plan funded, in part, by a disability insurance policy through Union Security Insurance Company (Union Security).[1] The benefits were provided by Union Security under Group Policy 4048742 (the Policy). The benefits plan is subject to the requirements of ERISA.

While employed by the Coalition, Ms. Holmes presented with a number of medical conditions, including breast cancer, cataplexy, apnea, blackouts, diabetes, carpal tunnel syndrome, and neuropathy. As a result, she filed a claim for disability benefits with Union Security on March 10, 2005. Union Security sent written notification to Ms. Holmes on May 27, 2005 that it had denied her claim because she failed to prove she was disabled as defined by the Policy. The denial letter included an explanation of Ms. Holmes's right to internal review of the decision and attached a copy of a Group Claim Denial Review Procedure (the Denial Review Procedure), which describes a two-level review process.

On November 21, 2005, in accordance with the Denial Review Procedure, Ms. Holmes filed a request for review of the denial (the first-level review). Union Security issued a decision on the first-level review 137 days later on April 7, 2006, when it

---

[1] Union Security was formerly known as Fortis Benefits Insurance Company. For convenience, we have replaced references to Fortis Benefits in the relevant documents with references to Union Security.

informed Ms. Holmes in writing that it had affirmed the denial of benefits. Union Security's April 7, 2006, letter contained a second copy of the Denial Review Procedure, which informed Ms. Holmes that she "may request another review of [Union Security's] decision," and that this second-level review is the "final level of administrative review available." Aplt. App. 235–36; 294–97. The Denial Review Procedure further states that if Ms. Holmes's claim is denied "as part of the [second-level review]," she will "have a right to bring a civil action." *Id.* at 236.

Rather than pursuing further administrative remedies at that time, Ms. Holmes took no action for over two years. Then, on April 28, 2008, she filed a civil action against the Colorado Coalition for the Homeless Long Term Disability Plan (the Defendant) in Colorado state court pursuant to ERISA's civil enforcement provisions. *See* 29 U.S.C. § 1132(a)(1)(B). The Defendant was unaware of the lawsuit and the state court entered default judgment against it. Upon learning of the suit, the Defendant removed the action to federal court and moved to have the default judgment set aside. The district court granted the Defendant's motion, holding that Ms. Holmes had not validly served process on it.

The proceedings in the district court continued and both parties sought summary judgment based on the undisputed facts in the Administrative Record. While those cross motions were pending, Ms. Holmes filed a motion to stay decision, reopen discovery, and proceed to trial, if necessary (the discovery motion). The basis of Ms. Holmes's discovery motion was that further discovery was needed to identify which document or set of documents actually constitutes the plan.

3

The district court denied the discovery motion and granted the Defendant's motion for summary judgment. It held Ms. Holmes's claim was barred because she failed to exhaust her administrative remedies by not seeking a second-level review as required by the plan. The court rejected Ms. Holmes's arguments that she should be deemed to have exhausted her administrative remedies because Union Security failed to render a timely decision on her first-level review or because Union Security did not provide notice of the two-level review process as required by ERISA. It concluded that although Union Security did not render a decision until 137 days after Ms. Holmes sought a first-level review, 67 of those days were attributable to Ms. Holmes's delay in providing Union Security with requested medical records. As a result, the district court held Ms. Holmes had forfeited her right to enforce the ERISA deadlines. The district court also held Union Security had complied with the applicable ERISA notice and disclosure requirements.

## II. DISCUSSION

Ms. Holmes claims the district court erred by determining she failed to exhaust her administrative remedies. In addition, she appeals two interlocutory decisions: the district court's order setting aside default judgment against the Defendant and its order denying her discovery motion. Ms. Holmes has not met her burden of adequately briefing her challenges to the interlocutory orders on appeal and we will not consider them further. *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1223 n.6 (10th Cir. 2008) (refusing to consider an argument where appellant failed to "'advanc[e] reasoned argument as to the grounds for the appeal'" (alteration in original) (quoting *Am. Airlines v. Christensen*, 967 F.2d 410, 415 n.8 (10th Cir. 1992))); *Adler v. Wal-Mart Stores, Inc.*,

4

144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . ."); *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) (stating that "a few scattered" and "perfunctory" statements that failed to frame and develop an issue were insufficient to invoke appellate review); *see also* Fed. R. App. P. 28(a)(9)(A) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."). Our review is therefore limited to determining the scope of Ms. Holmes's internal review obligations and whether the district court properly granted the Defendant summary judgment based on Ms. Holmes's failure to exhaust those administrative remedies.

This court reviews summary judgment orders de novo, applying the same standards as the district court. *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1201 (10th Cir. 2013). Summary judgment is available "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

According to Ms. Holmes, the undisputed facts of this case show that she, rather than the Defendant, is entitled to summary judgment on the issue of exhaustion. She offers two separate arguments in support. First, she contends she cannot be required to engage in a second-level review before bringing a civil action because such a requirement is not included in the summary plan description (SPD) provided by Union Security to plan participants. Second, and in the alternative, Ms. Holmes argues that even if such a requirement does exist, she should be deemed to have exhausted her administrative

5

remedies due to Union Security's failure to comply with ERISA's timing and notice requirements. We address each of these arguments in turn, beginning with the level of internal review required by the plan.

### A. *Ms. Holmes's Internal Review Obligations*

To determine whether Ms. Holmes was required to pursue a second-level review before she could file a civil action, we must first identify the documents that control her obligations under ERISA. ERISA addresses two categories of documents relevant here, which each serve a different purpose. The first is the plan document, which must specify in writing the basis on which payments are to be made under the plan. 29 U.S.C. § 1102(a)(1), (b)(4). Second, ERISA requires plan administrators to provide participants with a "summary plan description," which must reasonably apprise participants of their rights and obligations under the plan. 29 U.S.C. §§ 1002(21)(A), 1021(a), 1022, 1024. Although the plan documents contain the enforceable terms of the benefit plan, the summary plan description is intended to communicate the contents of the plan in understandable language to participants. *CIGNA Corp. v. Amara*, ___ U.S. ___, 131 S. Ct. 1866, 1877 (2011).

Ms. Holmes argues she cannot be required to engage in a second-level review because the SPD provided by Union Security does not describe a two-level review process. In response, the Defendant asserts that the two-level review process was incorporated into the SPD by reference. The underlying assumption of both arguments is that the enforceability of the two-level review process is dependent upon whether it is

6

part of the SPD. However, this analytical approach is unsound because it is inconsistent

with the distinct purposes of the SPD and the plan documents as established by ERISA.

In *Amara*, the Supreme Court clarified that the requirements of an ERISA plan

must be based on the terms of the plan document, which do not include the summary plan

description in all circumstances.[2] 131 S. Ct. at 1878 ("[S]ummary documents, important

as they are, provide communication with beneficiaries *about* the plan, but . . . their

statements do not themselves constitute the *terms* of the plan . . . .") (emphasis in

original)); *see also US Airways, Inc. v. McCutchen*, ___ U.S. ___, 133 S. Ct. 1537, 1548

(2013) ("The statutory scheme [of ERISA], we have often noted, 'is built around reliance

on the face of the written plan documents.'" (quoting *Curtiss-Wright Corp. v.*

*Schoonejongen,* 514 U.S. 73, 83 (1995))). The Supreme Court explained that where the

relevant term does not appear in the plan, it is not "necessarily . . . enforce[able] . . . as

the terms of the plan itself." *Amara*, 131 S. Ct. at 1877. For example, *Amara* held that a

court may not enforce the terms of a summary plan description which conflict with the

terms of the plan. *Id.* at 1876–77 (noting that the "statutory language speaks of

'*enforc[ing]*' the 'terms of the plan,' not of *changing* them" (alteration and emphasis in

---

[2] The Supreme Court issued *Amara* while this case was pending in the district court. Although Ms. Holmes cited *Amara* below as support for her discovery motion, she did not argue that it affected her requirement to engage in a second level of the internal review. On appeal, neither party has cited *Amara*. Nevertheless, we are bound by its holding in assessing Ms. Holmes's internal review obligations. *See Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014) (holding that appellate court has power to identify and apply governing law, even when not advanced by the parties).

7

original) (quoting 29 U.S.C. § 1132(a)(1)(B))). *Amara* did not address the question of when a term that is consistent with the plan, but not contained in it, can be enforced.

Considering that question after *Amara*, this circuit has enforced terms that do not appear on the face of the plan but do not conflict with it when they are authorized by or made part of the plan documents. For example, in *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1131 (10th Cir. 2011), we held that a provision granting discretion to the plan administrator contained only in the summary plan description was enforceable because it did not conflict with the plan and because the summary plan description expressly stated that it was part of the plan. We again enforced terms not contained in the plan in *Foster v. PPG Industries, Inc.*, 693 F.3d 1226, 1239 (10th Cir. 2012). There, we held a participant could not recover amounts his former wife fraudulently withdrew from his stock-ownership plan because he had failed to comply with withdrawal procedures contained only in the summary plan description. We concluded the procedures were enforceable because they did not conflict with the plan document, and because the plan document explicitly referenced them by stating that withdrawals must be "'made in accordance with procedures established by the Administrator.'" *Id.* at 1235. We explained,

> Even if the [summary plan description] did not constitute "terms" of the Plan, the procedures laid out in the [summary plan description] were explicitly referenced in the Plan Document and do not in any way contradict the Plan Documents. A participant who elected to defer withdrawal was required to make those withdrawals "in accordance with procedures established by the Administrator."

8

*Id.* at 1235 n.5; *see also Kennedy v. Plan Adm'r for DuPont Savings & Inv. Plan*, 555 U.S. 285, 288, 304 (2009) (holding that a plan administrator was entitled to distribute benefits pursuant to information contained in a beneficiary designation form because the plan document required "'[a]ll authorizations, designations and requests concerning the Plan [to] be made by employees in the manner prescribed by the [plan administrator],'" who provided the plan participants with specific beneficiary designation change forms (alterations in original)). These decisions indicate that a term not contained in the plan, which does not conflict with the plan, is enforceable where it is "authorized by, or reflected in" the plan. *Eugene S.*, 663 F.3d at 1131.

Accordingly, the correct analytical framework for determining Ms. Holmes's obligations with respect to internal review begins with an examination of the plan's requirements and then considers the extent to which other non-conflicting terms have been authorized by or reflected in the plan. Applying that analysis here, we first review the plan document and conclude it specifically authorized Union Security to advise Ms. Holmes of further appeal rights, which could include a second-level review. We next determine that Union Security advised Ms. Holmes of her further appeal rights by supplying her with a copy of the Denial Review Procedures. We then consider whether the SPD was made part of the plan and conclude that it was not. Finally, based on the plan and the additional terms authorized by it, we conclude Ms. Holmes was required to seek a second-level review.

1.      **The Plan Document**

We begin our analysis of the internal review procedures provided by the plan with an examination of the terms of the plan. The parties and the district court have identified the Policy as the plan document, and we do so as well. *See US Airways,* 133 S. Ct. at 1543 n.1 (rejecting an attempt to identify the plan documents for the first time on certiorari review and stating that "[b]ecause everyone in this case has treated the language from the summary description as though it came from the plan, we do so as well"). Accordingly, we turn to the language of the Policy to ascertain the plan's review procedures.

The Policy describes the internal review process by setting out the specifics of the first-level review, but noting only the possibility of further appeal rights. It states,

> **Review Procedure**
>
> You must request, in writing, a review of a denial of your claim within 180 days after you receive notice of denial.
>
> . . .
>
> We will review your claim after receiving your request and send you a notice of our decision within 45 days after we receive your request, or within 90 days if special circumstances require an extension. We will state the reasons for our decision and refer you to the relevant portions of the policy. We will also advise you of your further appeal rights, if any.[3]

---

[3] Ms. Holmes argues for the first time on appeal that the phrase "further appeal rights, if any" is ambiguous and therefore should be construed in her favor. Because it is raised for the first time on appeal, we do not consider this argument. *See United States v. Holmes*, 727 F.3d 1230, 1237 (10th Cir. 2013) ("[W]e do not permit new arguments on appeal when those arguments are directed to reversing the district court."); *Hickman v. GEM Ins. Co.*, 299 F.3d 1208, 1213 (10th Cir. 2002) (refusing to consider the argument that an ERISA plan was ambiguous because it was raised for the first time on appeal); *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir. 1993) ("[V]ague, arguable

Aplt. App. 146, 167 (emphasis omitted). Although the Policy describes only one level of internal review, it allows Union Security to advise the participant of further appeal rights when the decision on a first-level review is communicated to the claimant.

## 2.    The Denial Review Procedure

As permitted by the Policy, Union Security advised Ms. Holmes of her further appeal rights. It did so first in its decision denying Ms. Holmes's initial claim for benefits, and second in its decision on Ms. Holmes's first-level review. Each of those denial letters informed Ms. Holmes that a copy of the Denial Review Procedure was enclosed, which described her "rights with respect to [Union Security's] administrative appeals process," and "her right to bring a lawsuit." *Id.* at 233. In turn, the Denial Review Procedure, attached with each letter, explained the applicable time limits for seeking and rendering a decision on review and then clearly described a two-level review process that had to be exhausted before Ms. Holmes could proceed to court.[4] The Denial Review Procedure states, with our emphasis:

---

references to a point in the district court proceedings do not . . . preserve the issue on appeal." (brackets and internal quotation marks omitted)).

[4] In a citation of supplemental authority, Ms. Holmes asserts that because the Denial Review Procedure contains some permissive language, it is insufficient to impose a mandatory second-level internal review. We do not consider this argument because it was not raised before the district court or argued in Ms. Holmes's opening brief. *See Hickman*, 299 F.3d at 1213; *Adler*, 144 F.3d at 679.

11

**Appeal Process**

The following is an explanation of the steps [Union Security] will take in handling your appeal for benefits.

**First Review:** If you request a review of our decision, your claim will be reviewed by an individual not previously involved in the decision to deny your claim. The review will either overturn or uphold the denial. You will be notified of this decision in writing. However, before reaching our decision, it may be necessary to request additional information, an examination, an interview, or other evaluation, or consult with a health care professional or vocational expert regarding your claim.

**Second Review:** *If your claim is denied after your initial request for review, you may request another review of our decision.* Your request for review would then be forwarded to a manager in the Disability Claims area or to the [Union Security] Benefits Disability Claims Appeals Committee. *The decision of that manager or committee is the final level of administrative review available.*

**Right to Bring a Lawsuit**

*If your claim is denied* by the [Union Security] Disability Claims Appeals Committee or Disability Claims Manager *as part of the Second Review* described above, *you have the right to bring a civil action* under section 502(a) of [ERISA].

*Id.* at 235–36.

Although the Denial Review Procedure is more complete than the first-level review described in the Policy, it does not contradict the terms of the Policy. Rather than foreclosing the possibility of a second-level review, the Policy indicates that when Union Security informs a claimant of the decision on a first-level review, it may advise the participant of further appeal rights. When Union Security rendered its decision on Ms. Holmes's first-level review it did just that by including a copy of the Denial Review Procedure, which advised Ms. Holmes of her further rights and that she could pursue a

12

civil action after engaging in that second-level review. Thus, like the "procedures to be established by the administrator" in *Foster*, the Denial Review Procedure is authorized by the plan and enforceable against Ms. Holmes. *See Foster*, 693 F.3d at 1235 n.5; *see also Kennedy,* 555 U.S. at 304 (enforcing the terms of beneficiary designation change forms).

### 3.    The SPD

Rather than focus on the plan terms, Ms. Holmes and Union Security engage on whether the SPD describes a second-level review. In particular, Ms. Holmes points to the fact that the SPD describes only one level of internal review, without also indicating that the decision on that first-level review may include an explanation of her further appeal rights. As discussed, however, the SPD is not necessarily enforceable as the terms of the plan. *See Amara*, 131 S. Ct. at 1877. Here, the Policy—the plan document—does not authorize the review procedures as set forth in the SPD. Although it contains an explicit reference to further appeal rights communicated with the decision on the first-level review, it makes no reference to the appeal rights described in the SPD. Furthermore, unlike the summary plan description in *Eugene S.*, the SPD is not enforceable as part of the plan. To the contrary, the SPD expressly states that it "does not replace or modify the [Policy] in any way. The [Policy] is the contract which sets forth the terms and conditions of the benefits the Plan Sponsor chose to provide in its welfare benefit plan." Aplt. App. 163. As a result, the SPD review procedures are not enforceable as part of the plan.

Because the SPD's review procedures are neither authorized by, nor reflected in the plan, they do not inform our decision of whether Ms. Holmes was required to pursue a second-level review. Although any alleged discrepancies between the review

13

procedures described in the SPD and the plan requirements may be the basis for relief under ERISA's notice and disclosure requirements,[5] the enforceable terms of the plan are governed by the Policy, which is the plan document. The Policy, as supplemented by the authorized Denial Review Procedure, provides for a two-level review process.

## B.  Exhaustion of Administrative Remedies

Ms. Holmes engaged in only a first-level review before filing the present action and therefore did not actually exhaust her administrative remedies. Although ERISA contains no explicit exhaustion requirement, courts have uniformly required that participants exhaust internal claim review procedures provided by the plan before bringing a civil action. *See Heimeshoff v. Hartford Life & Accident Ins. Co.*, ___ U.S. ___, 134 S. Ct. 604, 610 (2013). Unless Ms. Holmes can establish some exception to the exhaustion requirement, her civil action is barred by her failure to engage in a second-level review.

Generally, a failure to exhaust will be excused in two limited circumstances—when resort to administrative remedies would be futile or when the remedy provided is inadequate. *See McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1263 (10th Cir. 1998). The Department of Labor added another exception to the exhaustion requirement when it amended the ERISA regulations in 2000 to provide that claimants are "deemed to have exhausted" their administrative remedies if a plan has failed to establish or follow

---

[5] *See* discussion *infra* Part II.B.2.

claims procedures consistent with the requirements of ERISA. *See* 29 C.F.R.

§ 2560.503-1(*l*) (the deemed-exhausted provision).[6]

Ms. Holmes argues she should be deemed to have exhausted her administrative remedies because the Defendant has failed to establish or follow claims procedures consistent with ERISA's requirements in two respects. First, Ms. Holmes asserts Union Security failed to render a decision on her first-level review within the time required by ERISA. Second, she contends the SPD is not consistent with ERISA's notice and disclosure requirements because it failed to describe the two-level internal review process. We are not persuaded by either argument.

### 1.  ERISA's Timing Requirements

In considering Ms. Holmes's argument that the decision on review was untimely, we first discuss ERISA's provisions governing the time in which a plan administrator must render a decision on review. We then apply those provisions to the present facts, rejecting Ms. Holmes's argument that the tolling provision is inapplicable. Ultimately, we conclude that Union Security's decision on Ms. Holmes's first-level appeal was timely, and therefore she should not be deemed to have exhausted her administrative remedies on this basis.

Although the statute itself contains no time limits, ERISA's regulations provide time restrictions on a plan's administrative review of a participant's claim for benefits. Two regulations govern a plan administrator's time for rendering a decision on review of

---

[6] The current regulations are applicable to claims filed after 2002. *See* 29 C.F.R. § 2560.503–1(o).

a denial of a claim for benefits. The first is 29 C.F.R. § 2560.503-1(i)(1), "Timing of notification of benefit determination on review" (the timing provision), which requires the plan administrator to notify the claimant of the decision on review "not later than [45] days after receipt of the . . . request for review . . . , unless the plan administrator determines that special circumstances . . . require an extension of time for processing the claim." *Id.*[7] Any such extension shall not exceed 45 days. *Id.* § 2650.503-1 (i)(3)(i).

The second regulation governing the time for review, § 2560.503-1(i)(4), "Calculating time periods" (the tolling provision), dictates how the time periods specified in the timing provision are calculated.[8] The tolling provision stays the running of the limits in the timing provision pending a participant's response to a request for additional information. The tolling provision states,

> For purposes of [the timing provision], the period of time within which a benefit determination on review is required to be made shall begin at the

---

[7] This provision describes a 60-day review period for non-disability claims, but 29 C.F.R. § 2650.503-1(i)(3)(i) provides that "claims involving disability benefits . . . shall be governed by paragraph (i)(1) of this section, except that a period of 45 days shall apply instead of 60 days for purposes of that paragraph." Because Ms. Holmes seeks disability benefits, we have inserted the applicable time limits into § 2560.503-1(i)(1).

[8] Ms. Holmes correctly observes the Defendant did not direct the district court to the tolling provision and the court did not consider it in reaching its decision. We apply the tolling provision despite the Defendant's failure to raise it below because in affirming a district court's decision, we are "'not limited to the particular legal theories advanced by the parties, but rather retain[] the independent power to identify and apply the proper construction of governing law.'" *Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014) (quoting *U.S. Nat'l Bank v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993)). *See also United States v. Lott*, 310 F.3d 1231, 1242 n.7 (10th Cir. 2002) (stating we may "'affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court'" (quoting *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994)).

16

> time an appeal is filed in accordance with the reasonable procedures of a plan, without regard to whether all the information necessary to make a benefit determination on review accompanies the filing. In the event that a period of time is extended as permitted pursuant to paragraph (i)(1), (i)(2)(iii)(B), or (i)(3) of this section due to a claimant's failure to submit information necessary to decide a claim, the period for making the benefit determination on review shall be tolled from the date on which the notification of the extension is sent to the claimant until the date on which the claimant responds to the request for additional information.

*Id.* § 2560.503-1(i)(4); *see generally Heimeshoff*, 134 S. Ct. at 613 (explaining the timing of the disability claims process under ERISA and recognizing that the time for review of an administrative appeal may be tolled due to a claimant's failure to provide information necessary to decide the claim). Thus, the running of the time limit for a decision on review is paused during the period of time between the administrator's request for additional information and the participant's response to that request. When the participant responds, the running of the time limit recommences and the plan administrator must render its decision before the time limit expires. If the plan administrator fails to do so, a participant is "deemed to have exhausted the administrative remedies." 29 C.F.R. § 2560.503-1(*l*).

Turning to the present facts, Ms. Holmes sought a first-level review of the initial denial of her claim for benefits on November 21, 2005. On the last day of its initial 45-day deadline, January 5, 2006, *see id.* § 2560.503-1(i)(1), Union Security notified Ms. Holmes that due to "special circumstances," additional time was required to complete the first-level review. The letter stated,

> I am contacting you to notify you that we require an extension of time for processing your appeal for long-term disability benefits. Special circumstances exist that prevent me from rendering a decision on your

appeal currently. The following are the reasons why additional time is required to make a determination of your claim:

1. I forwarded Ms. Holmes'[s] claim file to a physician to determine her limitations. The physician consultant has completed the review of the available record and has suggested obtaining a complete set of medical records from Drs. Kinnard, Hunter and Beers prior to completing a determination. Please forward a copy of Ms. Holmes's medical records to our attention as soon as possible.

Aplt. App. 181. The letter concluded, "We expect to make this determination no later than February 26, 2006." *Id.* Ms. Holmes did not respond to this letter.

Union Security again wrote to Ms. Holmes on February 2, 2006. It reiterated that "special circumstances exist that prevent [it] from rendering a decision on Ms. Holmes'[s] appeal," and renewed its request for a complete set of medical records. *Id.* at 180. When it received no response, Union Security sent a third letter on February 24, 2006, which again explained that "special circumstances" prevented it from rendering a decision on Ms. Holmes's first-level review because a complete set of medical records was "necessary in order to establish [Union Security's] liability." *Id.* at 179. Union Security received no response to this letter until March 13, 2006, when Ms. Holmes provided it with the requested records.

Union Security's notice to Ms. Holmes prior to the termination of the initial 45-day period, indicating that "special circumstances" prevented it from rendering a decision on her first-level review and requesting a complete set of her medical records, tolled the running of the time for decision. *See* 29 C.F.R. § 2560.503-1(i)(1)(i), (3)(i). Once Ms. Holmes responded, the time limit again began to run and, in light of the extension, Union Security was required to render a decision on Ms. Holmes's first-level review within 45

days. *See id.* § 2560.503-1(i)(4). By providing a decision 25 days later on April 7, 2006, Union Security acted well within the period permitted by ERISA.

Ms. Holmes hopes to avoid application of the tolling provision because Union Security failed to establish that the requested records were, in fact, "necessary" to decide her claim. However, ERISA's regulations governing extensions of time and calculating time periods on review place with the plan administrator the sole discretion to determine whether special circumstances exist requiring an extension of time for decision. The regulations provide that a plan administrator must notify the claimant of the decision on review within 45 days unless "*the plan administrator determines*" special circumstances require an extension of time, and if "*the plan administrator determines*" such an extension is required, he need only furnish written notice of the extension to the claimant. *See id.* § 2560.503-1(i)(1)(i), (i)(4) (emphasis added); *see also McDowell v. Standard Ins. Co.*, 555 F. Supp. 2d 1361, 1369 (N.D. Ga. 2008) ("[The third-party claims administrator] has unilateral authority to begin tolling an extension period insofar as [the third-party claims administrator] has discretion to determine what 'necessary' information is lacking."). The tolling provision does nothing to limit that discretion. It simply explains how time is calculated if Union Security makes such a determination. *See* 29 C.F.R. § 2560.503-1(i)(4).

As the third-party claims administrator,[9] Union Security could determine that special circumstances required additional time to render a decision. Because of the broad

---

[9] Because the Policy, which the parties identify and the district court treated as the plan document, does not specifically identify a plan administrator, the Coalition is the

discretion placed in Union Security under the plan and ERISA's regulations, we review

that decision under the arbitrary and capricious standard. *Geddes v. United Staffing*

*Alliance Emp. Med. Plan*, 469 F.3d 919, 927 (10th Cir. 2006) ("If a plan administrator

has been allotted discretionary authority in the plan document, the decisions of both it

and its agents are entitled to judicial deference"); *Gilbertson v. Allied Signal, Inc.*, 328

F.3d 625, 630 (10th Cir. 2003) (stating that because the plan granted discretionary

authority to a third-party claims administrator, the claims administrator's "decisions on

benefit claims should generally be reviewed under the arbitrary and capricious

standard."). Ms. Holmes points us to nothing indicating Union Security's decision that it

needed her entire medical file to complete her claim evaluation was arbitrary or

capricious. *See Winchester v. Prudential Life Ins. Co. of Am.*, 975 F.2d 1479, 1483 (10th

Cir. 1992) ("Indicia of arbitrary and capricious conduct include lack of substantial

---

default plan administrator. *See* 29 U.S.C. § 1002(16)(A), (B) (providing that the "plan sponsor" means the employer and the "administrator" means "the person specifically so designated by the terms of the instrument under which the plan is operated; [or] if an administrator is not so designated, the plan sponsor"). However, the Policy specifically provides that the Coalition has delegated to Union Security the "sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy." Aplt. App. 124, 145. Pursuant to this delegation, Union Security has the authority to administer claims for benefits and to determine benefits eligibility. *See, e.g.*, *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 926 (10th Cir. 2006) (recognizing a plan administrator's delegation of claims review authority to an independent, third-party claims agency as an appropriate exercise of fiduciary discretion); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 630 (10th Cir. 2003) (approving a plan administrator's delegation of discretionary authority to determine benefits eligibility to a third-party claims administrator); *see also* 29 U.S.C. § 1105(c)(1) ("The instrument under which a plan is maintained may expressly provide for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities . . . under the plan.").

20

evidence, mistake of law, bad faith, and conflict of interest."). Even weighing as a factor

Union Security's inherent conflict of interest as both the evaluator and payor of her

claim, there is no evidence Union Security acted in bad faith or otherwise improperly

sought to delay a decision on Ms. Holmes's internal appeal. *See Foster v. PPG Indus.,*

*Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2012) (holding that a plan administrator operating

under an inherent conflict of interest had not abused its discretion). To the contrary,

although the regulations provided Union Security 45 days to complete its review after

Ms. Holmes responded to the request for records, it rendered its decision on review only

25 days later. Furthermore, Ms. Holmes had the power to end the tolling period and

recommence the running of the time for decision simply by responding to Union

Security's request, even if the response was a refusal to provide the documents. *See* 29

C.F.R. § 2560.503-1(i)(4).

The deadline for a decision on Ms. Holmes's first-level of internal review was

tolled until she responded to Union Security's request for additional medical records.

Once the period recommenced, Union Security completed its review before the time limit

expired. Therefore, Ms. Holmes cannot be deemed to have exhausted her administrative

remedies on the basis that Union Security did not comply with ERISA's timing

regulations.[10]

---

[10] Because we conclude that Union Security actually complied with the ERISA time limits for rendering a decision on review, we need not consider the Defendant's argument that Union Security substantially complied with ERISA's timing requirements. *Compare Barboza v. Cal. Ass'n of Prof'l Firefighters*, 651 F.3d 1073, 1080 (9th Cir. 2011) (holding that a participant was deemed to have exhausted administrative remedies because the plan failed to comply with ERISA's timing regulations), *and Nichols v.*

### 2.    ERISA's Notice and Disclosure Requirements

According to Ms. Holmes, even if Union Security's decision on her first-level review was timely, she should nonetheless be deemed to have exhausted her administrative remedies because the SPD failed to comply with ERISA's notice and disclosure requirements. We begin our analysis of this argument by identifying the relevant notice and disclosure requirements under ERISA. Next, we review the SPD to determine whether it complies with those requirements. In making that assessment, we assume for purposes of analysis only that the district court correctly incorporated the Denial Review Procedure into the SPD by reference. Finally, we address whether any deficiencies in the SPD warrant excusing Ms. Holmes from exhausting her administrative remedies. We conclude the SPD does not meet ERISA's notice and disclosure requirements, but Ms. Holmes was not prejudiced by those deficiencies. As a result, we hold she is not deemed to have exhausted her administrative remedies.

Benefit plans regulated by ERISA are required to "establish and maintain reasonable claims procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560.503-1(b). If a claim is denied, plans must "provide adequate notice in writing to

---

*Prudential Ins. Co. of Am.*, 406 F.3d 98, 106–08 (2d Cir. 2005) (rejecting a plan's argument that it substantially complied with ERISA's timing requirements and holding that a "failure to adhere literally to the regulatory deadlines renders the claimant's administrative remedies exhausted by operation of law and consequently permits the claimant to seek review in the federal courts without further delay"), *with Tindell v. Tree of Life, Inc.*, 672 F. Supp. 2d 1300, 1310–12 (M.D. Fla. 2009) (holding that administrative remedies were not deemed exhausted where the plan substantially complied with ERISA's timing deadlines).

any participant or beneficiary whose claim for benefits under the plan has been denied . . . and . . . afford a reasonable opportunity . . . for a full and fair review . . . of the decision denying the claim." 29 U.S.C. § 1133. To effectuate that requirement, ERISA further provides that a claim denial notice shall contain a "description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action . . . following an adverse benefit determination on review." 29 C.F.R. § 2560.503-1(g)(1)(iv). Here, there is no dispute that the claim denial letters included the Denial Review Procedure, which described a two-level internal review and advised participants of their right to pursue a civil action after completing the second-level review.

In addition to the requirements affecting the contents of the plan and claim denial letters, ERISA mandates that plan administrators provide participants with a summary plan description. 29 U.S.C. §§ 1002(21)(A), 1021(a), 1022, 1024; *CIGNA Corp. v. Amara*, ___ U.S. ___, 131 S. Ct. 1866, 1877 (2011). The summary plan description must set forth the plan's policies "in a manner calculated to be understood by the average plan participant" and be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). The summary plan description's format may not mislead or fail to inform participants about the plan, and limitations or restrictions must not be "minimized, rendered obscure or otherwise made to appear unimportant." 29 C.F.R. § 2520.102-2(b). Of particular relevance here, the summary plan description must contain "[t]he procedures governing claims for benefits (including procedures for . . . reviewing denied

23

claims . . .), applicable time limits, and remedies available under the plan for the redress of claims which are denied in whole or in part." *Id.* § 2520.102-3(s).

If a plan fails to "establish and follow reasonable claims procedures," the claimant is "deemed to have exhausted the administrative remedies available under the plan" and is entitled to bring a civil action "on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." *Id.* § 2560.503-1(*l*). A claims procedure is reasonable only if "[a] description of all claims procedures . . . and the applicable time frames is included as part of a summary plan description." *Id.* § 2560.503-1(b)(2). Ms. Holmes contends that the SPD does not contain a description of the second-level review, the plan's claims procedure is therefore unreasonable, and she is deemed to have exhausted her administrative remedies on this basis. We are not convinced Ms. Holmes's failure to exhaust should be excused by deficiencies in the SPD.

### a. The SPD does not comply with ERISA.

We agree with Ms. Holmes that the SPD does not comply with ERISA. Before we address its deficiencies, we pause to identify the document in the record that constitutes the SPD. Union Security provided plan participants with the SPD in a Group Benefits booklet (the Booklet), which also includes an abbreviated version of the Policy. The copy of the double-sided Booklet in the Administrative Record was made without unbinding it, resulting in two pages of the Booklet appearing on each page in the record. The record copies of the Booklet pages are not in sequential order. For purposes of the argument before the district court and on appeal, neither Ms. Holmes nor the Defendant have

24

addressed the provisions in the Booklet as they appear when it is properly collated so that the pages run sequentially from 1 through 41. That simple task produces a document which clearly delineates between the abbreviated version of the Policy found at the beginning of the Booklet and the expressly identified "Summary Plan Description" which follows on pages 35 through 41.[11] Our analysis is of the SPD identified as such in the Booklet.

The SPD describes only one level of internal review. It contains a section with the heading "Claims Procedure," which states, "The following procedures apply to the extent benefits under your employee benefit plan are insured under a contract issued by [Union Security]." Aplt. App. 159; attachment, p. 40. Under the sub-heading "Notification of Decision—Disability," the SPD provides the time limits for a decision on an initial claim for benefits and then indicates that the plan administrator will provide written notice to the claimant "if the claim is denied in whole or in part," which will include "[a]n explanation of the plan's claim review procedure." Aplt. App. 159; attachment, p. 40. Thus, the SPD alerts participants that with a claim denial letter they will also receive information about the plan's review procedures.

The Claims Procedure section of the SPD also contains a sub-heading "Review Procedure—Disability" (SPD Review Procedure), which states with our emphasis:

> You are entitled to a full and fair review of denial of claim. You may make a request to the Plan Administrator or appropriate named fiduciary, if other than the Plan Administrator. *The procedure is as follows:*

---

[11] A properly organized copy of the Booklet is included as an attachment to this decision.

. . .

> [Union Security] will make a decision upon review within 45 days after receipt of the request unless special circumstances require an extension of time for processing in which case the time limit shall not be later than 90 days after receipt. The decision or review will be in writing, include the specific reasons for the decision and specific reference to the pertinent plan provisions on which the decision is based and be furnished either directly to you or to the Plan Administrator for delivery to you.

Aplt. App. 158; attachment, p. 41. This subsection is narrowly tailored to the review of disability claims and describes only one level of internal review.

Taken together, these provisions of the SPD fail to inform participants accurately of their internal review rights. Although the section of the SPD addressing the "Notification of Decision—Disability" indicates that the denial of the *initial claim* for benefits will include "[a]n explanation of the plan's claim review procedure," there is nothing in the SPD which indicates the description of the review procedure for disability claims is incomplete or that after the described first-level review, the claimant may be informed of additional appeal rights. Furthermore, unlike the Policy, the SPD does not indicate that Union Security will advise participants of "further appeal rights, if any," in its decision on a first-level review.[12] As a result, the SPD does not adequately inform participants of the second-level of internal review authorized by the plan and contained in the Denial Review Procedure.

---

[12] The abbreviated copy of the Policy included in the Booklet states, "we will also advise you of your further appeal rights, if any." Aplt App. 167; attachment, p. 31. Contrary to the parties' representations, this language does not appear in the SPD. *See* attachment, pp. 35–41.

Relying on *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620 (9th Cir. 2008), the district court held this deficiency was cured because the Denial Review Procedure was incorporated by reference into the SPD. In *Vaught*, the Ninth Circuit held a summary plan description's statement that "'a description of the plan's appeal procedures'" would be included with the claim denial letters was effective to incorporate those appeal procedures into the summary plan description, bringing it into compliance with ERISA's notice requirements. *Id.* at 627. Here, unlike in *Vaught*, even if we assume, without deciding, that the Denial Review Procedure was incorporated by reference,[13] it does not cure the SPD's deficiencies.

In *Vaught*, the summary plan description made no attempt to describe the claims review procedure, stating only that the plan's appeal procedures would be provided with the denial letters. In contrast, the Denial Review Procedure in the present case adds a second level of review that seems to conflict with the one level of disability review described in the SPD. As a result, even if the Denial Review Procedure were incorporated

---

[13] A document, even one that is not contemporaneous, may be incorporated by reference into a contract so long as "the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt." 11 Williston on Contracts § 30:25 (4th ed.) (citing federal law). *Compare Armstrong v. Fed. Nat'l Mortg. Ass'n*, 796 F.2d 366, 371 (10th Cir. 1986) (upholding incorporation by reference of a specifically identified "Servicing Contract Supplement," including subsequent amendments thereto), *with Pontchartrain State Bank v. Poulson*, 684 F.2d 704, 706 (10th Cir. 1982) (holding that a list of the debtor's equipment was not incorporated by reference into a security agreement and stating, "the doctrine of incorporation by reference is not applicable in this case because the promissory note makes no reference to the list.").

into the SPD, it does not reasonably apprise participants of the plan's review procedures

as required by ERISA.[14] 29 U.S.C. § 1022(a); 29 C.F.R. § 2520.102-2(b).

### b. Ms. Holmes has not established prejudice.

Based on the SPD's failure to describe the second-level review, Ms. Holmes

argues she is deemed to have exhausted her administrative remedies. Because she has not

alleged these deficiencies caused her failure to pursue a second-level review, we disagree.

As this circuit has previously recognized, "Courts have . . . been willing to

overlook [an] administrator['s] failure to meet certain procedural requirements when the

administrator has substantially complied with the regulations and the process as a whole

fulfills the broader purposes of ERISA and its accompanying regulations." *Gilbertson*,

328 F.3d at 634. Accordingly, we have excused deviations from ERISA's notice

requirements so long as the claimant has not been prejudiced thereby. *See Tomlinson v.*

*El Paso Corp.*, 653 F.3d 1281, 1295 (10th Cir. 2011) (recognizing that to obtain

injunctive relief, the plaintiff would be required to show actual harm from the plan's

breach of ERISA's requirement that the summary plan description reasonably apprise the

---

[14] The Defendant asks us to ignore this discrepancy because the statement in the "Claim Provisions" of the Policy, "we will also advise you of your further appeal rights, if any," put plan participants on notice that a second-level of internal review may be required. However, ERISA mandates that the SPD itself be "sufficiently accurate and comprehensive to reasonably apprise [plan] participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). "The regulations further provide that an SPD must not be 'misleading' and should not 'minimize[ or] render[] obscure' other restrictions on benefits." *Tomlinson v. El Paso Corp.*, 653 F.3d 1281, 1294 (10th Cir. 2011) (alteration in original) (quoting 29 C.F.R. § 2520.102-2(b)). The SPD, even as supplemented by the Denial Review Procedure, does not meet this standard.

participants of their rights and obligations under the plan); *Hickman v. GEM Ins. Co.*, 299

F.3d 1208, 1215 (10th Cir. 2002) (stating that "[s]ubstantial compliance with the

requirements of § 1133 [ERISA's claim denial notice provision] is sufficient," so long as

the violation does not cause the claimant a "substantive harm"); *Getting v. Fortis Benefits*

*Ins. Co.,* 5 F. App'x 833, 835 (10th Cir. 2001) (unpublished)[15] (declining to excuse

failure to exhaust where a plan participant claimed she was not provided with a copy of

the summary plan description but did receive claim denial letters that included a copy of

the review procedures, which she and her attorney followed in filing her first internal

appeal).[16]

---

[15] Although not precedential, we find the reasoning of this court's unpublished opinions instructive. *See* 10th Cir. R. 32.1 ("Unpublished opinions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

[16] Other circuits have also required claimants to establish prejudice caused by a plan administrator's failure to comply with ERISA's notice and disclosure requirements. *See, e.g.*, *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 493 (D.C. Cir. 1998) (holding that although an administrator failed to provide a claimant with notice of her right to appeal in its initial denial letter, it substantially complied with ERISA regulations where the claimant was informed of her right to appeal in subsequent communications and the claimant could not show that she was prejudiced by the claims procedure or denied a fair administrative review); *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1278–79 (5th Cir. 1990) (rejecting a claimant's argument that because he was not provided with a summary plan description he was not bound by internal review procedures where he did not claim the absence of the summary plan description prejudiced his ability to obtain plan benefits); *cf. Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 180 (2d Cir. 2013) ("[P]lan participants will not be required to exhaust administrative remedies where they reasonably interpret the plan terms not to require exhaustion and do not exhaust their administrative remedies *as a result*." (emphasis added)); *Conley v. Pitney Bowes*, 34 F.3d 714, 718–19 (8th Cir. 1994) (holding that exhaustion was not required when a claim denial notice did not advise the claimant of the appeal procedure and the claimant had no actual knowledge of that procedure).

The Defendant seeks a similar result here, relying on the reasoning of *Perrino v. Southern Bell Telephone & Telegraph Co.*, 209 F.3d 1309 (11th Cir. 2000), in which the Eleventh Circuit explained, "it makes little sense to excuse plaintiffs from the exhaustion requirement where an employer is technically noncompliant with ERISA's procedural requirements but . . . the plaintiffs still had a fair and reasonable opportunity to pursue a claim through an administrative scheme prior to filing suit in federal court." *Id.* at 1318. Ms. Holmes claims we should not rely on *Perrino* or similar cases because they were decided before the ERISA regulations were amended to include 29 C.F.R. § 2560.503-1(*l*)'s deemed-exhausted provision.[17] She suggests strict application of the deemed-exhausted provision is now mandated, even where a claimant is not prejudiced by technical violations of ERISA's notice and disclosure requirements. We disagree.

Limiting the application of the deemed-exhausted provision to instances where technical noncompliance with ERISA's notice and disclosure requirements has prejudiced the claimant's right to enjoy a reasonable claims procedure is consistent with the express language of the regulation, which provides that:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue [a civil action] *on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.*

---

[17] The Department of Labor amended the regulations implementing ERISA in 2000 and added both the tolling provision and the deemed exhausted provision. Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. 70246-01, 70246, 70250, 70255 (Nov. 21, 2000); *see* 29 C.F.R. § 2560.503-1(i)(4), (*l*).

29 C.F.R. § 2560.503-1(*l*) (emphasis added).[18] Under the provision, the right to pursue a

civil action without first exhausting the claims procedures provided by the plan is tied to

the plan's failure to provide a reasonable claims procedure.

Since the deemed-exhausted provision's effective date, the courts have been

charged with interpreting this language on a case-specific basis. Although this circuit has

not had prior occasion to consider application of the deemed-exhausted provision to

violations of ERISA's notice and disclosure requirements, other circuits have consistently

limited its application to situations where such violations prejudice claimants by denying

them a reasonable review procedure.[19] *See, e.g.*, *Schorsch v. Reliance Standard Life Ins.*

---

[18] By adopting § 2560.503-1(*l*), the Department of Labor intended to clarify "the consequences that ensue when a plan fails to provide procedures that meet the requirements of [the ERISA regulations]." Employee Retirement Income Security Act of 1974; Rules and Regulations for Administration and Enforcement; Claims Procedure, 65 Fed. Reg. at 70255. The Department published a draft of the provision during the rulemaking process and received comments expressing concern that the provision "would impose unnecessarily harsh consequences on plans that substantially fulfill the requirements of the regulation, but fall short in minor respects." *Id.* Some commentators requested that the proposed rule be tempered with a good faith exception or a requirement of actual harm to the claimant. *Id.* at 70256. The final version of the amended regulations retained the deemed-exhausted provision because "Claimants should not be required to continue to pursue claims through an administrative process that does not comply with the law." *Id.* It therefore determined that "*claimants denied access to the statutory administrative review process* should be entitled to take that claim to a court . . . for a full and fair hearing on the merits of the claim." *Id.* (emphasis added).

[19] Indeed, the Eleventh Circuit recently reaffirmed *Perrino* in an unpublished decision, holding that the claimant was required to exhaust his administrative remedies, despite technical deficiencies in a denial notice, where the deficiencies did not deprive the claimant of a reasonable claims procedure. *See McCay v. Drummond Co.*, 509 F. App'x 944, 947 & n.1, 948 (11th Cir. 2013) (unpublished). The Eleventh Circuit concluded that even under the "new" regulations, a claimant will be deemed to have exhausted his administrative remedies only where "'the plan has failed to provide a

*Co.*, 693 F.3d 734, 739, 740–41 (7th Cir. 2012) (holding a claimant could not be deemed to have exhausted her administrative remedies despite "irregularities" in the plan's benefits termination process, where participant could not show how these problems caused her not to seek internal review); *Chorosevic v. MetLife Choices*, 600 F.3d 934, 944 (8th Cir. 2010) (holding participant could not be deemed to have exhausted her administrative remedies where "the ERISA plan's actions or omissions [did not] deprive the claimant of information or material necessary to prepare for administrative review or appeal to federal courts"); *cf. Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1089 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 1242 (2013) (deeming the claimant to have exhausted administrative remedies where claimant actually "misconstrued a confusingly worded communication from her plan's claims administrator" to her detriment); *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 221–23 & n.10 (2d Cir. 2006) (holding that a claimant was deemed to have exhausted his administrative remedies where "there was no compliance, substantial or otherwise, with ERISA's claim requirements," but declining to decide whether the deemed-exhausted provision would apply "where existing claims procedures comply substantially with the requirements of ERISA"); *see also Amara*, 131 S. Ct. at 1881–82 (discussing the harm required to bring a civil enforcement claim under ERISA for failure of the summary plan description to reasonably apprise participants of plan requirements and concluding that although the claimant may not need to show detrimental reliance on the deficient

reasonable claims procedure that would yield a decision on the merits of the claim.'" *Id.* at 947 n.1.

summary plan description, she must establish actual harm); *Tomlinson*, 653 F.3d at 1293 n.10 ("[T]he Supreme Court recently altered the required showing of prejudice for some ERISA claims, but even under this new, more lenient standard, 'actual harm must be shown.'" (quoting *Amara*, 131 S. Ct. at 1882)). We agree that the deemed-exhausted provision is limited to instances in which the notice and disclosure deficiencies actually denied the participant a reasonable review procedure.[20]

Here, Ms. Holmes has not alleged that she lacked notice of the two-level internal review process, that she was confused about the review process, or that she reasonably believed seeking a second-level review was merely voluntary. Nowhere in the briefing before this court or the district court does Ms. Holmes explain how Union Security's failure to describe the second-level review in the SPD caused her not to follow the review process as described in the Denial Review Procedure, which Union Security provided to her on two occasions, and which she and her attorney followed in seeking a first-level

---

[20] Recent guidance from the Department of Labor is consistent with this approach. Answers to frequently asked questions about ERISA published by the Department state,

> *[n]ot every deviation by a plan from the requirement of the regulation justifies proceeding directly to court.* . . . If the plan's procedures provide an opportunity to effectively remedy the inadvertent deviation *without prejudice to the claimant*, through the internal appeal process or otherwise, then *there ordinarily will not have been a failure to establish or follow reasonable procedures* as contemplated by § 2560.503-1(*l*).

U.S. Dep't of Labor, Employee Benefits Security Administration, FAQs About The Benefit Claims Procedure Regulation, FAQ F-2, http://www.dol.gov/ebsa/faqs/faq_claims_proc_reg.html (last visited July 7, 2014) (emphasis added); *see Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 223 n.10 (2d Cir. 2006) (citing the Department of Labor's FAQ section for the position that "'not every deviation by a plan from the requirement of the regulation justifies proceeding directly to court.'").

review. *See Getting*, 5 F. App'x at 836. Similarly, she has not alleged that the claims procedure itself was unreasonable or that the deficient SPD prevented her from obtaining a decision on the merits of her claim.[21]

Because Union Security's failure to include the details regarding the two-level internal review process in the SPD did not prejudice Ms. Holmes by denying her a fair and reasonable opportunity to pursue her claim through the plan's internal review process, the district court correctly rejected her argument that she should be deemed to have exhausted her administrative remedies based on deficiencies in the SPD.

### III. CONCLUSION

The plan document authorized the further appeal procedures described in the Denial Review Procedure and they are enforceable against Ms. Holmes. Union Security rendered a timely decision on Ms. Holmes's first-level review and the SPD's failure to describe the second-level review did not prejudice Ms. Holmes. As a result, Ms. Holmes was required to exhaust her administrative remedies before filing this action. The district court correctly determined that she failed to exhaust those remedies by not pursuing a second-level review.

For the foregoing reasons, we **AFFIRM** the district court's decision that Ms. Holmes's claim under ERISA is barred.

---

[21] It is not unreasonable for a plan to require two levels of mandatory internal review. 29 C.F.R. § 2560.503-1(c)(2), (c)(3), (d); *Price v. Xerox Corp.*, 445 F.3d 1054, 1056 (8th Cir. 2006).

# ATTACHMENT

# Group Benefits

**Colorado Coalition for the Homeless**

**Long Term Disability**

# TABLE OF CONTENTS

GENERAL DEFINITIONS.................................................................. 3
DEFINITIONS FOR LONG TERM DISABILITY INSURANCE ................. 5
ELIGIBILITY AND TERMINATION PROVISIONS................................ 13
    Exception to Effective Date ....................................................... 13
    When Your Insurance Ends ....................................................... 13
CONTINUITY OF COVERAGE ........................................................ 14
    Definitions............................................................................... 14
    Continuity of Coverage............................................................. 14
    Prior Plan Credit for Long Term Disability Insurance ................... 15
LONG TERM DISABILITY INSURANCE ........................................... 16
    Insurance Provided .................................................................. 16
    Amount of Benefit.................................................................... 16
    Offset Amount ......................................................................... 16
    Other Sources ......................................................................... 18
    Estimate of Benefits or Other Amounts...................................... 18
    Social Security Assistance ........................................................ 19
    Adjustment of Benefits ............................................................. 20
    Lump Sum Benefit.................................................................... 20
    Benefit Freeze ......................................................................... 20
    Managed Rehabilitation Benefit ................................................. 20
    Quality of Care Benefit ............................................................. 23
    Exclusions .............................................................................. 24
    Alcoholism, Drug Addiction, Chemical Dependency, and Mental Illness
    .............................................................................................. 25
    Pre-Existing Conditions............................................................. 26
    Extended Benefit...................................................................... 27
    Conversion Privilege ................................................................ 27
    Survivor Benefit....................................................................... 27
CLAIM PROVISIONS .................................................................... 29
    Payment of Benefits ................................................................. 29
    To Whom Payable.................................................................... 29
    Authority ................................................................................. 29
    Filing a Claim .......................................................................... 29
    Proof of Loss .......................................................................... 30
    Right to Examine or Interview .................................................... 30
    Limit on Legal Action ............................................................... 31
    Review Procedure .................................................................... 31
    Subrogation Rights................................................................... 31
    Incontestability ........................................................................ 31
GENERAL PROVISIONS ............................................................... 33
    Entire Contract ........................................................................ 33

# TABLE OF CONTENTS (continued)

Errors .................................................................................. 33
Misstatements ..................................................................... 33
Certificates ......................................................................... 33
Workers' Compensation ....................................................... 33
Agency ................................................................................ 33
Fraud .................................................................................. 34

# GENERAL DEFINITIONS

These terms have the meanings shown here when *italicized*. The pronouns "we", "us", "our", "you", and "your" are not *italicized*.

*Active work* means the expenditure of time and energy for the *policyholder* or an *associated company* at your usual place of business on a *full-time* basis. If you are working on the day your coverage would otherwise take effect, you will be considered to be at *active work* on that day only if, when your work begins on that day, it would be reasonable to expect that you would be physically and mentally able to complete a *full-time* week of work in your *regular occupation*.

*Associated company* means any company shown in the *policy* which is owned by or affiliated with the *policyholder*.

*Contributory* means you pay part of the premium.

*Covered person* means an eligible employee or member of the *policyholder*, or an *associated company* who has become insured for a coverage.

*Doctor* means a person acting within the scope of his or her license to practice medicine, prescribe drugs or perform surgery. Also, a person whom we are required to recognize as a *doctor* by the laws or regulations of the governing jurisdiction, or a person who is legally licensed to practice psychiatry, psychology or psychotherapy and whose primary work activities involve the care of patients, is a *doctor*. However, neither you nor a *family member* will be considered a *doctor*.

*Eligible class* means a class of persons eligible for insurance under the *policy*. This class is based on employment or membership in a group.

*Family member* means a person who is a parent, spouse, child, sibling, domestic partner, grandparent or grandchild of the *covered person*.

*Full-time* means working at least 32 hours per week, unless indicated otherwise in the *policy*.

*Home office* includes our Home Office located in St. Paul, Minnesota, and our office in Kansas City, Missouri.

*Injury* means accidental bodily injury. It does not mean intentionally self-inflicted injury while sane.

## GENERAL DEFINITIONS (continued)

*No-fault motor vehicle coverage* means a motor vehicle plan that pays disability or medical benefits without considering who was at fault in any accident that occurs.

*Noncontributory* means the *policyholder* pays the premium.

*Policy* means the group policy issued by us to the *policyholder* that describes the benefits for which you may be eligible.

*Policyholder* means the entity to whom the *policy* is issued.

*Proof of good health* means evidence acceptable to us of the good health of a person.

We, us, and our mean Fortis Benefits Insurance Company.

You and your mean an employee or member of the *policyholder* or an *associated company* who has met all the eligibility requirements for a coverage.

# DEFINITIONS FOR LONG TERM DISABILITY INSURANCE

*Accommodation expense* means the costs your employer incurs to accommodate your *disability*, as required by the Americans with Disabilities Act or similar legislation. It also means costs you incur for tools, equipment, furniture, computer software, or other items necessary for you to return to work. The amount of the *accommodation expense* will be limited to $3,000 for each *period of disability*.

*Appropriate medical plan* means either an appropriate plan to arrive at a more accurate or more supported diagnosis of your medical condition(s), or an appropriate plan of treatment of your medical condition(s), or both.

*Disability* or *disabled* means that in a particular month, you satisfy either the Occupation Test or the Earnings Test, as described below. You may satisfy both the Occupation Test and Earnings Test, but you need only satisfy one Test to be considered *disabled*.

Occupation Test

- during the first 36 months of a *period of disability* (including the *qualifying period*), an *injury*, sickness, or pregnancy requires that you be under the *regular care and attendance* of a *doctor*, and prevents you from performing at least one of the *material duties* of your *regular occupation*; and

- after 36 months of *disability*, an *injury*, sickness, or pregnancy prevents you from performing at least one of the *material duties* of each *gainful occupation* for which your education, training, and experience qualifies you.

If, during the first 36 months of a *period of disability* (including the *qualifying period*), you can perform the *material duties* of your *regular occupation* with *reasonable accommodation(s)*, you will not be considered *disabled*. If, after 36 months of a *period of disability*, you can perform a *gainful occupation* for which your education, training, and experience qualifies you, with *reasonable accommodations(s)*, you will not be considered *disabled*. The inability to perform a *material duty* because of the discontinuance of *reasonable accommodation(s)* on the part of the employer does not, in itself, constitute *disability*.

## DEFINITIONS FOR LONG TERM DISABILITY INSURANCE
### (continued)

Earnings Test

You may be considered *disabled* in any month in which you are actually working, if an *injury*, sickness, or pregnancy, whether past or present, prevents you from earning more than 80% of your *indexed monthly pay* in that month in any *occupation* for which your education, training or experience qualifies you. On each anniversary of the date your *disability* started, we will use your *indexed monthly pay* to decide whether you are *disabled* under this test.

If your actual earnings during any month are more than 80% of your *indexed monthly pay* you will not be considered *disabled* under the Earnings Test during that month. In making this determination, salary, wages, partnership or proprietorship draw, commissions, bonuses, or similar pay, and any other income you receive or are entitled to receive will be included. However, sick pay and salary continuance for periods not at work will not be included. Any lump sum payment will be pro-rated, based on the time over which it accrued or the period for which it was paid.

If you are capable of earning more than 80% of your *indexed monthly pay*, you will not be considered *disabled* under the Earnings Test even if your actual earnings in that month are less than 80% of your *indexed monthly pay*.

You may still be considered *disabled* according to the Occupation Test, without regard to your level of current earnings, if you meet the requirements of that Test.

If you meet the Earnings Test, *full-time* work in which you are performing all of the *material duties* of your *regular occupation* or some other *occupation* will not interrupt the *qualifying period* or the *period of disability*. If you meet the Occupation Test only, work on less than a *full-time* basis or work in which you are not doing all of the *material duties* of your *regular occupation*, will not interrupt the *qualifying period* or the *period of disability*.

*Education expense* means, in your *rehabilitation plan*, the reasonable costs you incur which are required for your education or training to return to work. These costs may include the cost of tuition, books, computers, and other equipment. In your spouse's *rehabilitation plan*, *education expense* means the reasonable costs your spouse incurs

which are required for your spouse's education or training. These costs may include the cost of tuition, books, computers, and other equipment.

*Family care expense* means the amount you spend for care of a family member in order for you to work or be retrained under a *rehabilitation plan*. To qualify:

- your family member must be under age 13, or be physically or mentally incapable of caring for him or herself;

- your family member must be dependent on you for support and maintenance; and

- the person who cares for your family member cannot be a relative.

Not more than $350 per family member per month will be included. A pro-rated amount will apply to any period shorter than a month.

*Gainful occupation* means an *occupation* in which you could reasonably be expected to earn at least as much as your Schedule Amount within 12 months of your return to work.

*Government plan* means the United States Social Security Act, the Railroad Retirement Act, the Canadian Pension Plan, similar plans provided under the laws of other nations, and any plan provided under the laws of a state, province, or other political subdivision. It also includes any public employee retirement plan or any teachers' employment retirement plan, or any plan provided as an alternative to any of the above acts or plans. It does not include any Workers' Compensation Act or similar law, or the Maritime Doctrine of Maintenance, Wages, or Cure.

*Hospital* means a facility supervised by 1 or more *doctors* and operated under state and local laws. It must have 24-hour nursing service by registered graduate nurses. It may specialize in treating alcoholism, drug addiction, chemical dependency, or mental disease, but it cannot be a rest home, convalescent home, or a home for the aged.

*Hospital confined* and *hospital confinement* mean staying in a *hospital* for 24 hours a day.

*Indexed monthly pay* means your *monthly pay* increased by the lesser of 10% or the annual percentage increase in the Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) as of the most

recent cost of living computational quarter, as defined by the Social Security Administration, on each anniversary of the date your *disability* started.

*Long term disability insurance* means the group long term disability insurance under the *policy* issued by us to the *policyholder.*

*Material duty or material duties* mean the sets of tasks or skills required generally by employers from those engaged in an *occupation*, which cannot be reasonably accommodated. We will consider one *material duty* of your *regular occupation* to be the ability to work for an employer on a *full-time* basis as defined in the *policy*. However, if a *material duty* of your *regular occupation* is to work more than 40 hours per week, we will consider you able to perform that *material duty* if you have the capacity to work at least 75% of those hours per week. In addition, no duty will be considered a *material duty* of your *regular occupation* if you were not able, as a result of *injury*, sickness, or pregnancy, to perform that duty with reasonable consistency at the time you became a *covered person* or entered that *occupation*, if later.

*Medical expense* means the reasonable costs you incur for medical treatment, physical therapy, and adaptive equipment necessary for your vocational rehabilitation, in excess of amounts paid or payable by third parties and any amounts under a policy of major medical coverage.

*Mental illness* means a mental disorder as listed in the current edition of the Diagnostic and Statistical Manual of Mental Disorders, as published by the American Psychiatric Association. A *mental illness*, as so defined, may be related to or be caused by physical or biological factors, or result in physical symptoms or expressions. For the purposes of the *policy*, *mental illness* does not include any mental disorder listed within any of the following categories found in the Diagnostic and Statistical Manual of Mental Disorders, as published by the American Psychiatric Association:

- Mental Retardation;

- Motor Skills Disorder;

- Pervasive Developmental Disorders;

- Delirium, Dementia, and Amnestic and other Cognitive Disorders; and

- Narcolepsy, Obstructive Sleep Apnea, and Sleep Disorder due to a general medical condition.

*Moving expense* means the costs you incur to move more than 35 miles so that you can attend school or accept gainful work. In a spouse's *rehabilitation plan*, the costs are those incurred by the family so that the spouse can attend school or accept gainful work.

*Nationally recognized authorities* means the American Medical Association (AMA), the AMA Board of Medical Specialties, the American College of Physicians and Surgeons, the Food and Drug Administration, the Centers for Disease Control, the Office of Technology Assessment, the National Institutes of Health, the Health Care Finance Administration, the Agency for Health Care Policy and Research, the Department of Health and Human Services, the National Cancer Institute, the American Psychiatric Association, and any additional organizations we choose which attain similar status.

*Occupation* means a group of jobs or related jobs:

- in which a common set of tasks is performed; or

- which are related in terms of similar objectives and methodologies, and which may be related in terms of materials, products, worker actions, or worker characteristics.

*Other plan* means any group disability plan sponsored by your employer, the *policyholder*, or an *associated company*, except the one provided under the *policy*.

*Period of disability* means the time that begins on the day you become *disabled* and ends on the day before you return to *active work*. If you satisfy the *qualifying period* and then:

- return to *active work*;

- become *disabled* again; and

- remain insured under the *policy*;

the same *period of disability* may continue. Your return to *active work* must be for less than:

- 6 months, if the later *disability* results from the same cause, or a related one; or

- 1 day, if the later *disability* results from a different cause.

If your return to *active work* meets either of the above conditions, you do not have to satisfy the *qualifying period* again. The Maximum Benefit Period will continue on the day you become *disabled* again.

If you return to *active work* for more than the time shown above, and then become *disabled* again, you will start a new *period of disability*. You must satisfy the *qualifying period* again and the Maximum Benefit Period will start over.

*Qualifying period* means the length of time during a *period of disability* that you must be *disabled* before benefits are payable. If you satisfy the Earnings Test during the entire *qualifying period*, the Maximum Interruption During Qualifying Period in the Schedule will not apply. If application of the Occupation Test and the Maximum Interruption During Qualifying Period would result in an earlier entitlement to benefits, we will apply those provisions instead of the Earnings Test. In satisfying the Occupation Test, if you:

- return to *active work* during the *qualifying period* for no more than the maximum number of days shown in the Schedule;

- remain insured under the *policy*; and

- become *disabled* again for the same cause or one related to it;

you will not have to satisfy again the part of the *qualifying period* that you have already fulfilled.

In any case, you cannot satisfy any part of the *qualifying period* by any *period of disability* that results from a cause for which we do not pay benefits.

Any days of *active work* (including weekends in between) will not count in satisfying the *qualifying period*.

*Quality of care services* means services which are designed to assist you in reaching and maintaining the functional capacity to work in a *gainful occupation* with reasonable continuity.

DefLt99

10

## DEFINITIONS FOR LONG TERM DISABILITY INSURANCE
## (continued)

*Reasonable accommodation(s)* means any modification(s) to the worksite, the job or employment practices, which would allow you to perform the *material duties* of the *occupation* and which would not create an undue hardship for the employer.

*Regular care and attendance* means care by a *doctor* at a frequency medically appropriate for your condition. If your condition does not require frequent visits to your *doctor*, neither will we.

*Regular occupation* means the *occupation* in which you were working immediately prior to becoming *disabled*.

*Rehabilitation plan* means a written statement, developed by us, which describes:

- the vocational rehabilitation goals for you;

- our responsibilities, your responsibilities, and the responsibilities of any other parties to the plan; and

- the timing of the implementation and expected completion of the plan, to the extent that it can be established, assuming your full cooperation.

The *rehabilitation plan* will be designed to enable you to return to work in a *gainful occupation*.

A spouse's *rehabilitation plan* means a written agreement between you, your spouse, and us in which, at your request, we agree to provide, arrange or authorize appropriate vocational or physical rehabilitation services.

*Retirement plan* means a formal or informal retirement plan, whether or not under an insurance or annuity contract. It does not include:

- a plan you pay for entirely;

- a qualified profit-sharing plan;

- a thrift plan;

- an individual retirement account (IRA);

- a tax sheltered annuity (TSA);

- a stock ownership plan;

- a *government plan*; or

- a plan that qualifies under Internal Revenue Service Code 401(k).

*Social security plan* means:

- the United States Social Security Act;

- the Railroad Retirement Act;

- the Canadian Pension Plan; or

- any similar plan provided under the laws of any other nation.

It also means any public employee retirement plan, or teachers' employment retirement plan provided as an alternative to rather than a supplement for such plans.

*SSA representatives* are persons or organizations which specialize in assisting people to obtain disability benefits under the United States Social Security Act. If you appoint an *SSA representative*, and they agree you are a good candidate, they will help you pursue your Social Security claim.

DefLt99

## ELIGIBILITY AND TERMINATION PROVISIONS

**Exception to Effective Date**

If you are not at *active work* on the day you would otherwise become insured, your insurance will not take effect until you return to *active work*. If the day your coverage would normally take effect is not a regular work day for you, your coverage will take effect on that day if you are able to do your regular job.

**When Your Insurance Ends**

Your insurance will end on the date:

- the *policy* ends;

- the *policy* is changed to end the insurance for your *eligible class*;

- you are no longer in an *eligible class*;

- you stop *active work*; or

- a required contribution was not paid.

# CONTINUITY OF COVERAGE

## Definitions

*Prior plan* means the *policyholder's* plan of group long term disability insurance, if any, under which you were insured on the day before the Effective Date of the *policy*.

*Prior plan benefits* mean the benefits, if any, that would have been paid to you under the *prior plan* had it remained in effect, and had you continued to be insured under the *prior plan*.

## Continuity of Coverage

We will provide continuity of coverage if you were covered under the *prior plan*.

If you are not at *active work* on the Effective Date of the *policy* due to a disability, you are not eligible to become insured under the *policy*. However, we will cover you for the *prior plan benefits* until the earlier of:

- the date you return to *active work*; or

- the end of any period of continuance or extension of the *prior plan*.

If you are not at *active work* on the Effective Date of the *policy* due to a reason other than a disability, and would otherwise be eligible to become insured under the *policy*, we will cover you for the *prior plan benefits* until the earliest of:

- the date you return to *active work*;

- the end of any period of continuance of the *prior plan*; or

- the date coverage ends, according to the provision of the *policy*.

Any benefits payable under the conditions described above will be paid by us:

- as if the *prior plan* had remained in effect; and

- will be reduced by any benefits paid or payable by the *prior plan*.

If you are at *active work* on the Effective Date of the *policy*, you will be insured under the *policy*.

## Prior Plan Credit for Long Term Disability Insurance

The benefits payable for *disability* due to a pre-existing condition are limited or excluded unless you meet certain requirements. For any *disability* which would be limited or excluded during the time period to which this limitation or exclusion applies, we will give you credit for time periods which were met under the prior plan by providing the lesser of:

- the benefits of the *policy* without the pre-existing conditions provision, or

- *prior plan benefits* (applying the *prior plan's* pre-existing conditions provision, if any) just as if it had remained in effect.

If you are not eligible for *prior plan benefits* or benefits under the *policy*, no benefit will be paid.

The definition of *period of disability* in the *policy* describes the conditions that must be met for two or more disabilities to be considered as having occurred during one *period of disability*. This allows you to avoid having to satisfy a separate *qualifying period* for each *disability*. If you received benefits under the *prior plan*, and become *disabled* again while insured under the *policy*, we will apply this definition just as though the *policy* had been in effect since the date you first became *disabled*.

If we accept a copy of the enrollment card you submitted under the *prior plan*, time insured under the *prior plan* will be credited toward the time-insured requirement shown in the Incontestability section of the Claim Provisions.

# LONG TERM DISABILITY INSURANCE

## Insurance Provided

If you become *disabled* while insured under the *policy*, we will pay long term disability benefits if you satisfy the *qualifying period*. We will continue to pay benefits during your *disability*, but not beyond the Maximum Benefit Period. Any benefits are subject to the provisions of the *policy*.

## Amount of Benefit

The amount of benefit we will pay is the lesser of:

- the Schedule Amount minus the Offset Amount; or

- the Monthly Payment Limit minus the sum of the Offset Amount and the Other Sources.

However, we will not pay less than the Minimum Benefit.

## Offset Amount

If you are eligible for any of the following benefits or other amounts, the total of all monthly benefits and other amounts plus the pro-rated amount of any lump sum payments will be subtracted from the Schedule Amount:

- If you are eligible to receive any salary, wages, partnership or proprietorship draw, commissions, or similar pay from any work you do, we will not consider such income for the 12 consecutive months starting on the day you become entitled to it, as long as the sum of:

  o the income described above,

  o the Schedule Amount, and

  o benefits from any source described in Other Sources,

  is not more than 100% of your *monthly pay*. If the sum is more than 100% of your *monthly pay*, we will subtract the amount over 100% from the Schedule Amount when determining your benefit under the *policy*.

LTD99                                                                                  16

After 12 months, we will consider 50% of the amount determined after reducing any salary, wages, partnership or proprietorship draw, commissions or similar pay you are eligible to receive from any work you do, by any *family care expense*.

- group disability benefits from any *other plan*.

- disability benefits from the United States Social Security Act, including dependent benefits, payable because of your *injury*, sickness, or pregnancy.

- disability benefits from a *government plan*, except Social Security.

- any benefits (except medical or death benefits) or any amount received in a settlement or compromise of your rights, under:

  o any Workers' Compensation Act (or a similar law); or

  o the Maritime Doctrine of Maintenance, Wages or Cure.

- retirement benefits from the United States Social Security Act unless your *disability* begins after age 65 and you were already receiving such retirement benefits.

- retirement benefits, disability benefits, or similar benefits (not including your contributions) from a *retirement plan* sponsored by your employer, the *policyholder*, or an *associated company*.

  We will not consider any amounts rolled over or transferred into any eligible retirement plan unless such amounts are subsequently withdrawn during the Maximum Benefit Period, at which time we will subtract such amounts retroactively without regard to any other provisions of the *policy*.

  Early retirement benefits from a *retirement plan* will be included only if:

- o    you choose to receive them; or

- o    they would not reduce the normal retirement benefit under the *retirement plan* sponsored by your employer.

- any amount you receive (including any amount you received in a settlement or compromise) because of a claim for any of the sources listed in the Offset Amount.

- retirement benefits from a *government plan*.

## Other Sources

- any amount you receive of a type included in your *monthly pay* for the purpose of determining your *long term disability insurance* benefit under the *policy*.

- any amount you receive (including any amount you received in a settlement or compromise) because of a claim for any of the sources listed in the Other Sources.

- any group disability insurance contract, except one sponsored by your employer, the *policyholder*, or an *associated company*.

- any *no-fault motor vehicle coverage*, unless:

  - o    state law or regulation does not allow group disability benefits to be reduced by benefits from *no-fault motor vehicle coverage*; or

  - o    the *no-fault motor vehicle coverage* determines its benefits after benefits have been paid under the *policy*; or

  - o    the benefits are provided under optional coverage.

## Estimate of Benefits or Other Amounts

If:

- you are eligible for benefits or other amounts from any of the above sources; or

- it is reasonable to believe that you would be paid such benefits or other amounts if you had applied for them or had applied for them on time;

we will figure your monthly benefit as though you are receiving these other benefits or amounts, even if you are not.

We will:

- estimate the amount of your Social Security benefit; and

- offset that amount as described above;

until we receive notice of a denial of such benefits at the first level of appeal after an initial denial.

We will adjust your monthly benefit when we receive proof that such benefits or other amounts are not payable or are denied.

**Social Security Assistance**

Your claim for Social Security disability benefits may be denied up to the reconsideration level. If it is, we will have it reviewed by an *SSA representative*, at your request.

If we consider you a good candidate, we will start this process. We will give you a list of *SSA representatives*. If you choose from this list, we will pay their fee.

Whether you use our help or not, we will reimburse you for the fee charged you by your *SSA representative*. In order to obtain this reimbursement, you must become entitled to Social Security disability benefits while eligible for benefits under our *policy*. If you are no longer eligible for benefits under the *policy* but then become entitled to Social Security disability benefits retroactive to a date while you were still eligible for benefits under the *policy*, we will reimburse you for the fee charged you by an *SSA representative*. Our reimbursement is limited to the fee approved by the Social Security Administration. We may reduce any overpayment calculated in our claim.

## Adjustment of Benefits

If we find that the amount of benefit which we should have paid is different from the amount of benefit we actually paid you, we will adjust your benefit.

If we paid you less than we should have, we will pay you the difference.

If we paid you more than we should have, you must reimburse us. Any future benefits we determine to be due, including the Minimum Benefit, will be applied to the overpayment until we are reimbursed in full.

## Lump Sum Benefit

If you receive benefits from any source in a lump sum, we will pro-rate it over the time in which it accrued, based on information from the source of the payment. If we do not receive all the information we need, we will pro-rate the payment according to its nature and purpose.

## Benefit Freeze

We will not reduce your monthly benefit further if the amount of benefits from any source, other than the *policy*, changes because of a cost of living increase that occurs automatically or by law after you satisfy the *qualifying period*.

## Managed Rehabilitation Benefit

### Rehabilitation Plan for You

You may be eligible to receive vocational rehabilitation services. In order to be eligible for such services you must have the functional capability to successfully complete a *rehabilitation plan*.

Vocational rehabilitation services will include the preparation of a *rehabilitation plan* for you, with input from you and your *doctor*. We, you, your *doctor*, or your employer can begin the process of developing a *rehabilitation plan*. Vocational rehabilitation services may include, at our sole discretion, payment of your *medical expense, education expense, moving expense, accommodation expense*, or *family care expense*.

While you are participating, with your full cooperation, in your *rehabilitation plan*, we will increase your Schedule Amount by 10% of your *monthly pay* or $1,000, whichever is less. During

this period, your Schedule Amount may exceed the maximum Schedule Amount in the Schedule.

If you return to work as part of a *rehabilitation plan* while you are *disabled*, we will pay your employer:

- 100% of your salary, wages, partnership or proprietorship draw, commissions, or similar pay; or

- the Schedule Amount, if less;

for the first month after you return to work, or your remaining *period of disability*, if less.

If your *disability* ends while you are participating, with your full cooperation, in your *rehabilitation plan*, and you are not able to find gainful work, we will:

- pay you the amount of benefit, other than rehabilitation benefits, that would have been payable to you if you had remained *disabled* until:

  o 3 months after your *disability* ends; or

  o the date you are able to find gainful work, if earlier; and

- provide or pay for reasonable job placement services for a period of up to 3 months after your *disability* ends.

Failure to participate with your full cooperation in the *rehabilitation plan*, without good cause, will result in the reduction or the end of your *long term disability insurance* benefits. If benefits end, your *long term disability insurance* coverage under the *policy* will end. Reduction of benefits will be based on your projected income if you had met the goals of the *rehabilitation plan*. Benefits will be figured as though you were:

- actually working in the *occupation* contemplated in the *rehabilitation plan*; and

- earning the projected income amount.

If such work at the projected income amount would have resulted in the end of your *long term disability insurance*

LTD99                                                                                              21

benefits, your benefits will end as of the expected completion of the *rehabilitation plan*. "Good cause" means a medical reason preventing implementation of the *rehabilitation plan*.

We will make the final determination of any vocational rehabilitation services provided, of your eligibility for participation, and of any continued benefit payments.

**Rehabilitation Plan for Your Spouse**

You and your spouse may ask to participate in a *rehabilitation plan* for your spouse while you are *disabled* if:

- you are receiving disability benefits from a *social security plan*; and

- your spouse's earnings in the six calendar months prior to your *disability* averaged less than 60% of your *monthly pay*.

We have the sole discretion to approve or deny your request. The terms and conditions of the *rehabilitation plan* must be mutually agreed by you, your spouse, and us.

The *rehabilitation plan* for your spouse may include, at our discretion, payment of your spouse's *education expense*, reasonable job placement expenses, and the family's *moving expense*, if any. It may also include *family care expense* incurred by your spouse, necessary in order for your spouse to be retrained under the *rehabilitation plan*.

We will reduce the amount of your benefit we pay you by 50% of any salary, wages, partnership or proprietorship draw, commissions, or similar pay from any work your spouse does as a result of participating in your spouse's *rehabilitation plan*. If your spouse is working when your spouse's *rehabilitation plan* begins, we will only reduce your benefit by 50% of the increase in income that results from your spouse's participation in your spouse's *rehabilitation plan*.

**Quality of Care Benefit**

You may be eligible for *quality of care services*, while you are *disabled*. *Quality of care services* will be provided at our sole discretion. In providing *quality of care services*, we will help develop an *appropriate medical plan* for you. As part of the *appropriate medical plan*, we may:

- arrange any necessary second medical opinions or specialty consultations;

- recommend referral to therapeutic programs including, but not limited to, physical therapy, occupational therapy, speech therapy, exercise programs, mental health programs, pain clinic programs, and other medical rehabilitation programs;

- identify durable medical equipment which might improve your ability to function;

- provide published medical materials for you or your *doctor*, and refer you to support groups for people with similar impairments;

- negotiate discounts for your benefit with providers of medical services, equipment, or prescription drugs;

- help you identify third parties who may pay for needed therapeutic programs, equipment, or services; or

- pay for reasonable costs you incur to participate in the plan, in excess of amounts paid or payable by third parties (including any amounts receivable under a policy of medical coverage). We may pay for such costs if you would not otherwise be able to undertake the necessary therapeutic program or receive the services. We will consider, among other things, the likelihood that such programs or services will result in an overall lowering of benefits payable to you under the *policy*.

If we find that an *appropriate medical plan* for your condition has not yet been developed for you, we will develop and endorse such a plan, with input from you and your *doctor*. If we find that your *doctor* has devised an *appropriate medical plan* for you, but you have not followed that plan consistently, we will endorse that plan. In making our decision to endorse a plan, we will rely on the currently published

guidelines with respect to your medical condition from *nationally recognized authorities*. If more than one *appropriate medical plan* exists, you and your *doctor* may choose the one most appropriate for you.

*Long term disability insurance* benefits and your coverage under the *policy* will both end, without regard for any other provisions of the *policy*, if:

- there is unreasonable failure on your part to undergo a scheduled examination for a second medical opinion or specialty consultation; or

- once we have endorsed an *appropriate medical plan* for you, you fail to comply with this plan without good cause. "Good cause" means a medical reason preventing implementation of the plan.

We will make the final determination of any *quality of care services* provided, of your eligibility for participation, and of any continued benefit payments.

### Exclusions

We will not pay benefits for any time you are confined to any facility because you were convicted of a crime or public offense.

We will not pay benefits for any *disability* caused by:

- war or any act of war, whether declared or not;

- intentionally self-inflicted injury, while sane; or

- taking part in or the result of taking part in committing an assault or felony.

We will not pay benefits if:

LTD99                                                                24

- your employer, the *policyholder*, or an *associated company* has offered you the opportunity to return to limited work while you are *disabled*;

- you are functionally capable of performing the limited work which is offered; and

- you do not return to work when and as scheduled.

Benefits will end as of the date you were first scheduled to return to work. Subject to the terms of the *policy*, benefits will recommence on the earlier of the date you return to such work, if you remain *disabled*, or the date your *disability* worsens so that you are no longer capable of such work.

## Alcoholism, Drug Addiction, Chemical Dependency, and Mental Illness

We pay only a limited benefit for a *period of disability* due to alcoholism, drug addiction, chemical dependency and *mental illness*. The Maximum Benefit Period for all such *periods of disability* is 24 months. This is not a separate maximum for each such condition, or for each *period of disability*, but a combined maximum for all *periods of disability* and for all of these conditions.

Your *period of disability* will be considered due to alcoholism, drug addiction, chemical dependency or *mental illness* if:

- you are limited by one or more of the stated conditions; and

- you do not have other conditions which, in the absence of the stated conditions, would continue to exist, limit your activities, and lead us to conclude that you were *disabled*.

Benefits may be payable for more than 24 months, but not beyond the Maximum Benefit Period in the Schedule, if you

- are *hospital confined* at the end of the 24-month period above, and

- remain *disabled*.

Benefits will be payable for the length of your confinement and for up to 60 days following the end of your confinement.

If you are *hospital confined* again during the 60-day period for at least 10 consecutive days, benefits will be payable for the length of the second confinement and for up to 60 days following the end of the second confinement.

**Pre-Existing Conditions**

We will not pay benefits for any *disability* resulting, directly or indirectly, from a pre-existing condition (defined below) unless the *disability* begins after the earlier of:

- 3 consecutive months, ending on or after the day you became insured under the *long term disability insurance policy*, during which you do not consult with or receive advice from a licensed medical or dental practitioner or receive medical or dental care, treatment or services, including taking drugs, medicine, insulin, or similar substances, for that condition; or

- 12 consecutive months during which you are continuously insured under the *long term disability insurance policy*.

A "pre-existing condition" means an *injury*, sickness, pregnancy, symptom or physical finding, or any related *injury*, sickness, pregnancy, symptom or physical finding, for which you:

- consulted with or received advice from a licensed medical or dental practitioner; or

- received medical or dental care, treatment, or services, including taking drugs, medicine, insulin, or similar substances

during the 3 months that end on the day before you became insured under the *long term disability insurance policy*.

If your *disability* results from more than one condition, we will determine whether you would be *disabled* in the absence of all pre-existing conditions. If we conclude that you are *disabled* by one or more conditions which are not pre-existing conditions, we will consider your claim as not resulting from a pre-existing condition for so long as this remains true.

### Extended Benefit

If you are *disabled* on the day your *long term disability insurance* ends, and if you remain *disabled* long enough to qualify, we will pay benefits according to the *policy*.

### Conversion Privilege

If your *long term disability insurance* ends, you may be able to convert to coverage provided under a conversion policy. You must have been insured under the *policy* for at least a year. This includes time insured under any similar group policy which the *policy* replaces.

Within 31 days after your insurance ends, you must:

- apply for coverage under the conversion policy; and

- pay the first premium.

*Proof of good health* is not required.

You cannot convert if your *long term disability insurance* ends because:

- the *policy* ends;

- the *policy* is changed to end your coverage;

- you are *disabled*;

- a required premium is not paid; or

- you retire from your employer, the *policyholder*, or an *associated company*.

The benefits of the conversion policy will be those we offer for conversion at the time you apply. The premium will be based on rates in effect for conversion policies at that time. The effective date of coverage will be the day after your insurance under the *policy* ends.

### Survivor Benefit

If you die while entitled to benefits under the *policy*, we will pay a survivor benefit. We must receive proof of your death and proof that the person claiming the benefit is entitled to it. We will pay the survivor benefit only to your lawful spouse, if living, otherwise, to your children. Children must be unmarried, and under age 21 or, if a full-time student, age 25. "Children" include step-children or foster children that

depended on you for support and maintenance.  Adopted children are also included.

The monthly survivor benefit equals the monthly benefit payable under the *policy* for your last full calendar month of *disability*.  If no benefit was paid for a full calendar month, a survivor benefit for a full month will be determined.

The survivor benefit is payable on:

- the first of the month after your death; and

- the first of each of the next 2 months.

If no one entitled to the survivor benefit is living on the first of any month after your death, we will not pay a survivor benefit.

Payment of the survivor benefit is subject to the other provisions of the *policy*.

# CLAIM PROVISIONS

## Payment of Benefits

We will pay benefits at the end of each month (or shorter period) for which we are liable, after we receive the required proof. If any amount is unpaid when *disability* ends, we will pay it when we receive the required proof.

## To Whom Payable

We will pay all benefits to you. However, if medical evidence indicates that a legal guardian should be appointed, we will hold further benefits due until such time as a guardian of your estate is appointed and we will pay benefits to such guardian at that time. If any amount remains unpaid when you die, we will pay your estate.

## Authority

The *policyholder* delegates to us and agrees that we have the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the *policy*. All determinations and interpretations made by us are conclusive and binding on all parties.

## Filing a Claim

1.  You must send us notice of the claim. We must have written notice of any insured loss within 30 days after it occurs, or as soon as reasonably possible. You can send the notice to our *home office*, to one of our regional group claims offices, or to one of our agents. We need enough information to identify you as a *covered person*.

2.  Within 15 days after the date of your notice, we will send you certain claim forms. The forms must be completed and sent to our *home office* or to one of our regional group claims offices. If you do not receive the claim forms within 15 days, we will accept a written description of the exact nature and extent of the loss.

3.  The time limit for filing a claim is 90 days after the end of the first month (or shorter period) for which we are liable.

4.  To decide our liability, we may require:

- proof of benefits from other sources, and

- proof that you have applied for all benefits from other sources, and that you have furnished any proof required to get them.

### Proof of Loss

Within 30 days of the start of your *disability*, you should give us proof that you are currently *disabled* and have been continuously *disabled* since your last day of *active work*. Proof must be given within 90 days after the end of your *qualifying period*. If proof of loss is first received by us more than 180 days after the end of the *qualifying period*, your Schedule Amount will be reduced by 30%.

Continuing proof of *disability* must be given as often as we may reasonably require. Continuing proof must be given within 60 days of our request.

You must provide us with all of the information we specify as necessary to determine proof of loss and decide our liability. This may include but is not limited to medical records, hospital records, pharmacy records, test results, therapy and office notes, mental health progress notes, medical exams and consultations, tax returns, business records, Workers' Compensation records, payroll and attendance records, job descriptions, Social Security award and denial notices, and Social Security earnings records.

You must provide us with a written authorization allowing the sources of medical, vocational, occupational, financial, and governmental information to release documents to us which enables us to decide our liability. If you do not provide us with continuing proof of *disability* and the items and authorization necessary to allow us to determine our liability, we will not pay benefits.

### Right to Examine or Interview

We may ask you to be examined as often as we require at any time we choose. We may require you to be interviewed by our authorized representative. We will pay third party charges for any independent medical exam or interview which we require. If you fail to attend or fully participate, we will not pay benefits.

## Limit on Legal Action

No action at law or in equity may be brought against the *policy* until at least 60 days after you file proof of loss. No action can be brought after the applicable statute of limitations has expired, but, in any case, not after 3 years from the date of loss.

## Review Procedure

You must request, in writing, a review of a denial of your claim within 180 days after you receive notice of denial.

You have the right to review, upon request and free of charge, copies of all documents, records, and other information relevant to your claim for benefits, and you may submit written comments, documents, records and other information relating to your claim for benefits.

We will review your claim after receiving your request and send you a notice of our decision within 45 days after we receive your request, or within 90 days if special circumstances require an extension. We will state the reasons for our decision and refer you to the relevant provisions of the *policy*. We will also advise you of your further appeal rights, if any.

## Subrogation Rights

If we have paid or will pay benefits under the *policy* in connection with a *disability* which you suffered because of an act or omission of a third party, we reserve any and all rights of recovery you have against the third party to the extent necessary to protect our interest. We have the right to bring legal action against the third party on your behalf to recover our payments. You must agree to furnish all information and documents that are necessary to secure those rights to us. We will pay for any expenses connected with our pursuit of subrogation or recovery.

If you make any recovery of amounts from the third party, the amount of your recovery which is subject to our subrogation interest must be paid to us.

## Incontestability

The validity of the *policy* cannot be contested after it has been in force for 2 years, except if premiums are not paid.

Any statement made by the *policyholder* or a *covered person* will be considered a representation. It is not considered a warranty or

Clm as modified by PC-ALL-144,176                                                  31

## CLAIM PROVISIONS (continued)

guarantee. A statement will not be used in a dispute unless it is written and signed, and a copy is given to the *covered person* or the *beneficiary*.

No statement, except fraudulent misstatement, made by a *covered person* about insurability will be used to deny a claim for a loss incurred or *disability* starting after coverage has been in effect for 2 years.

No claim for loss starting 2 or more years after the *covered person's* effective date may be reduced or denied because a disease or physical condition existed before the person's effective date, unless the condition was specifically excluded by a provision in effect on the date of loss.

# GENERAL PROVISIONS

## Entire Contract

The *policy* and the *policyholder's* application attached to it are the entire contract. Any statement made by you or the *policyholder* is considered a representation. It is not considered a warranty or guarantee. A statement will not be used in a dispute unless it is written and signed, and a copy is given to you.

## Errors

An error in keeping records will not cancel insurance that should continue nor continue insurance that should end. We will adjust the premium, if necessary, but not beyond 3 years before the date the error was found. If the premium was overpaid, we will refund the difference. If the premium was underpaid, the difference must be paid to us.

## Misstatements

If any information about you or the *policyholder's* plan is misstated or altered after the application is submitted, including information with respect to participation or who pays the premium and under what circumstances, the facts will determine whether insurance is in effect and in what amount. We will retroactively adjust the premium.

## Certificates

We will send certificates to the *policyholder* to give to each *covered person*. The certificate will state the insurance to which the person is entitled. It does not change the provisions of the *policy*.

## Workers' Compensation

The *policy* is not in place of, and does not affect any state's requirements for coverage by Workers' Compensation insurance.

## Agency

Neither the *policyholder*, any employer, any *associated company*, nor any administrator appointed by the foregoing is our agent. We are not liable for any of their acts or omissions.

## Fraud

It is unlawful to knowingly provide false, incomplete or misleading facts or information with the intent of defrauding us. An application for insurance or statement of claim containing any materially false or misleading information may lead to reduction, denial or termination of benefits or coverage under the *policy* and recovery of any amounts we have paid.

## SUMMARY PLAN DESCRIPTION

This Summary Plan Description is issued to you in compliance with the Employee Retirement Income Security Act of 1974 (ERISA). Included within this document is your Certificate of Insurance, issued by Fortis Benefits Insurance Company in compliance with state law. Your Summary Plan Description does not replace or modify the Master Policy issued by Fortis Benefits Insurance Company in any way. The Master Policy is the contract which sets forth the terms and conditions of the benefits the Plan Sponsor chose to provide in its welfare benefit plan. The Master Policy may be amended at any time by agreement between the Plan Sponsor and Fortis Benefits Insurance Company. The Master Policy may be terminated at any time by the Plan Sponsor or may be terminated by Fortis Benefits Insurance Company for non-payment of premium or for failure to meet the Master Policy's minimum participation requirements. The Plan Administrator has the obligation to prepare, issue, amend and file the Summary Plan Description (SPD) and is solely responsible for its contents.

## GENERAL ADMINISTRATIVE PROVISIONS

**Name of the Plan:**     Colorado Coalition for the Homeless

**Plan Sponsor:**     Colorado Coalition for the Homeless
2111 Champa St
Denver, CO 80205
(303) 285-5246

**Employer I.D. Number:**     EIN 84-0951575

**Type of Plan:**     An employee welfare plan providing benefits for:

Long Term Disability Insurance

**Plan Number:**     PN507 unless another number is assigned by the employer, the Plan Administrator, or on any Form 5500 filed for the Plan.

**Effective Date:**     The plan, as described in this SPD, became effective on January 1, 2005.

35

**Who Is Eligible:** Each full-time employee who is at active work in the United States of America is eligible for coverage.

Full-time means working at least 32 hours per week. Any employee working less than 32 hours per week or any temporary or seasonal worker is excluded.

The plan may also cover other persons not included above. Check with the plan administrator.

**Plan Administrator:** Colorado Coalition for the Homeless
Ms. Michelle Lucero
2111 Champa St
Denver, CO  80205
(303) 285-5246

**Type of Administration:** This plan is insured by a contract with Fortis Benefits Insurance Company, 2323 Grand Boulevard, Kansas City, Missouri 64108.

**Amendment or Termination of Plan:** This plan may be amended or terminated at any time by the Plan Sponsor.

**Agent for Service of Legal Process:** Colorado Coalition for the Homeless
Ms. Michelle Lucero
2111 Champa St
Denver, CO  80205
(303) 285-5246

**Plan Records:** The fiscal records for the plan are kept on a policy year basis ending each December 31.

**Cost of Benefits:** The premiums for the Long Term Disability Insurance plan are paid for entirely by the Plan Sponsor.

**Your plan includes:** Long Term Disability Insurance

The benefits, limitations and exclusions are described in the Certificate which is found within this Description.

## STATEMENT OF ERISA RIGHTS

As a participant in this Plan you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974. ERISA provides that all plan participants shall be entitled to:

(i)     Examine, without charge at the plan administrator's office and at other specified locations such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and, if required, a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

(ii)    Obtain, upon written request to the plan administrator, copies of all documents governing the plan including insurance contracts and collective bargaining agreements, and, if required, copies of the latest annual report (Form 5500 Series) and the updated summary plan description. The administrator may make a reasonable charge for the copies.

(iii)   Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

In addition to creating rights for plan participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate our plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for welfare benefits is denied in whole or in part you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request certain materials from the plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court may decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and legal fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## CLAIMS PROCEDURE

The following procedures apply to the extent benefits under your employee benefit plan are insured under a contract issued by Fortis Benefits Insurance Company.

### PRESENTING A CLAIM

Contact your plan administrator, who will advise you of any forms which are required. These forms should be returned to the Plan Administrator after completion. This Administrator will review them, complete any information concerning eligibility and forward them to Fortis Benefits Insurance Company. Time limits for filing the claim and other requirements for notice and proof of loss may be found under the heading, "Filing A Claim".

### NOTIFICATION OF DECISION—DISABILITY

A decision will be made within 45 days after receipt by Fortis Benefits Insurance Company of a properly executed, complete proof of loss unless circumstances beyond the control of the Plan require an extension of time for processing the claim. Such an extension of time may not exceed 30 additional days unless circumstances beyond the control of the Plan require a second extension, not to exceed an additional 30 days. If the claim is denied in whole or in part, Fortis Benefits Insurance Company will provide written notice either directly to you or to the Plan Administrator for delivery to you. The written notice will contain:

1. The specific reason or reasons for the denial;

2. Specific reference to pertinent provisions of the policy upon which the decision is based;

3. A description of any additional material or information needed to perfect the claim and an explanation of why it is necessary; and

4. An explanation of the plan's claim review procedure.

### AUTHORITY

The Plan Sponsor delegates to Fortis Benefits Insurance Company and agrees that Fortis Benefits Insurance Company has the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the Policy. All determinations and

interpretations made by Fortis Benefits Insurance Company are conclusive and binding on all parties.

## REVIEW PROCEDURE—DISABILITY

You are entitled to a full and fair review of denial of claim. You may make a request to the Plan Administrator or appropriate named fiduciary, if other than the Plan Administrator. The procedure is as follows:

1. The request for review must be in writing and made within 180 days of receipt of written notice of denial;

2. You have the right to review, upon request and free of charge, copies of all documents, records, and other information relevant to your claim for benefits. You have the right to review copies of any internal rule, guideline, protocol or other similar criterion that was relied upon in making our decision to deny your claim. You have the right to submit issues and comments in writing, along with additional documents, records, and other information relating to your claim;

3. The Plan Administrator will forward the request to Fortis Benefits Insurance Company;

4. Fortis Benefits Insurance Company will make a decision upon review within 45 days after receipt of the request unless special circumstances require an extension of time for processing in which case the time limit shall not be later than 90 days after receipt. The decision or review will be in writing, include the specific reasons for the decision and specific references to the pertinent plan provisions on which the decision is based and be furnished either directly to you or to the Plan Administrator for delivery to you.

# CERTIFICATE OF
## GROUP INSURANCE

**Fortis Benefits Insurance Company** certifies that the insurance stated in this Certificate became effective on the Effective Date shown in your Schedule. This Certificate is subject to the provisions of the below numbered *policy* issued by Fortis Benefits Insurance Company to the *policyholder*.

Policyholder:        Colorado Coalition for the Homeless

Group Policy Number:   4,048,742

Participation Number:   0

Type of Coverage:

    **Group Long Term Disability Insurance**

This Certificate replaces any and all Certificates and Certificate Endorsements, if any, issued to you under the *policy*.

*Michael J Peninger*

Executive Vice-President

GC-90
CF

# SCHEDULE

## Eligible Persons

To be eligible for insurance, a person must be a member of an Eligible Class. The person must also complete a period of continuous service (Service Requirement) with the *policyholder* (or any *associated company*).

**Eligible Class:** Each *full-time* employee of the *policyholder* or an *associated company*,
- who is at *active work*, and
- who is working in the United States of America,

as identified on the *policyholder's* or our records, except any temporary or seasonal worker.

**Associated Companies:**       None

## Service Requirement:

On January 1, 2005:       None

After January 1, 2005:       None

## Entry Date

Insurance will take effect on the later of (i) the date shown below, and (ii) the day all the eligibility requirements are met.

## Effective Date of Insurance

January 1, 2005 (subject to Entry Date)

## Long Term Disability Insurance

**Schedule Amount:** 60% of *monthly pay* subject to a maximum Schedule Amount of $5,000 per month, except as stated in Proof of Loss provision.

For each day of a period less than a full month, the Schedule Amount will be 1/30th of the amount determined above.

Schd

## SCHEDULE (continued)

*Monthly pay* means your basic monthly pay from the *policyholder* or an *associated company*, and is determined on the day before the *period of disability* starts. Bonuses, overtime, and other compensation not considered by us as basic wages or salary are not included. However, a monthly average of any commissions received during the prior full calendar year will be included. If you have been eligible to receive commissions for less than a full calendar year, *monthly pay* will include a monthly average of commissions received during the time you were eligible to receive them.

If you are an hourly employee, *monthly pay* will be based on your hourly rate of pay, but not on more than 40 hours per week.

**Minimum Benefit:** If you normally work at least 32 hours per week before your *period of disability* starts, the minimum monthly benefit will be the greater of (i) $100 or (ii) 10% of the Schedule Amount. For any part of a *period of disability* less than a full month, the Minimum Benefit is 1/30th of the amount determined above for each day of *disability* after the *qualifying period* ends.

**Qualifying Period:** 60 days

**Maximum Interruption During Qualifying Period:** 10 days

This Maximum applies to all returns to *active work* during any one *qualifying period*.

**Monthly Payment Limit:** 70% of *monthly pay*

**Maximum Benefit Period:** We will not pay benefits beyond the maximums stated below, based on the person's age on the day the *period of disability* started.

| Age | Maximum Benefit Period |
|---|---|
| Before 60 | the day before retirement age* |
| 60 but before 65 | the day before retirement age* or 36 months of *disability***, whichever is longer |
| 65 but before 68 | 24 months of *disability*** |
| 68 but before 70 | 18 months of *disability*** |
| 70 but before 72 | 15 months of *disability*** |

Schd

**SCHEDULE (continued)**

72 or more                          12 months of *disability***

*"Retirement age" means the Social Security Normal Retirement Age as stated in the 1983 revision of the United States Social Security Act.

**following the end of the *qualifying period*.

Schd

**Fortis Benefits**
**Insurance Company**
2323 Grand Boulevard
Kansas City, MO 64108-2670

Policy 4,048,742
Participant 0
Booklet 3
4/18/2005